# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| CHRISTOPHER ADAMS, | ) | |
| | ) | Case No. 1:16-cv-335 |
| *Plaintiff,* | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Susan K. Lee |
| DAVE BAKER, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## TRIAL OPINION

---

Plaintiff Christopher Adams is an inmate in the custody of Tennessee Department of Corrections ("TDOC") at Bledsoe County Correctional Complex ("BCCX"). BCCX includes several industry buildings where Tennessee Rehabilitative Initiative in Correction ("TRICOR"), a legislatively created program, provides jobs to inmates. *See* Tenn. Code Ann. § 41-22-402(3). Adams worked as a board counter as part of a TRICOR operation that hand-hews wood flooring boards for Shaw Industries Group ("Shaw"). (Doc. 213, at 250, 253, 288.)

This action arises from Adams's interactions with his supervisor, Dave Baker, who was the TRICOR Operations Manager. Adams alleges that Baker retaliated against him for his informal grievances about unfair workplace procedures in violation of his First Amendment rights.[1] Ultimately, after complaining, Adams spent nine days in segregation and lost his job.

This matter proceeded to a bench trial on April 1 and 2, 2019. Neither party moved for judgment as a matter of law. In lieu of oral closing arguments, the Court allowed each party to

---

[1] Plaintiff's previous complaints stated that these were Due Process violations, but his third amended complaint alleges only violations of his First Amendment rights. (Doc. 57.)

file written submissions with citations to the evidence presented at trial. The following opinion sets forth the Court's findings of fact and conclusions of law.

## I. SUMMARY OF TESTIMONY AND EXHIBITS PRESENTED AT TRIAL

Most of the material facts presented at trial were undisputed, although the parties' interpretations of those facts differ. However, the parties' accounts of their interaction on August 31, 2015—the day Adams was escorted from the TRICOR wood-flooring plant (the "plant")—contrast sharply.

### A. The Time-Clock and Board-Counting Issues

During the summer of 2015, Adams was a support worker earning $8.45 per hour, $1.20 more per hour than the lowest wage in the plant. (Doc. 213, at 169.) His assignment as one of the ten board counters was the "least strenuous" and one of the most desirable jobs available to inmates at the plant. (Doc. 212, at 98, 104, 110; Doc. 213, at 226–27.) Adams secured this position in part because of his seniority rank. (Doc. 212, at 105; Doc. 213, at 169.) He had worked his way up from the more strenuous assignment of board scraper and had received good performance evaluations. (Pl. Ex. 5, at 2–6; Pl. Ex. 3; Pl. Ex. 12, at 8.)

Baker worked for TDOC for about seventeen years in various capacities, including as a disciplinary-board sergeant and a clerical officer in the library at BCCX. (Doc. 213, at 208–09.) In June 2015, Baker resigned from TDOC to become TRICOR Operations Manager at the plant. (*Id.*)

Before Baker began working at the plant, workers discovered a time-clock issue that was resulting in inmate employees receiving less pay than they were due. (Doc. 212, at 101, 111–12.) Joseph Overman, an inmate who also worked at TRICOR, testified that Adams was concerned about all employees' shorted pay, in addition to his own. (*Id.* at 112.) According to

Overman, Adams would speak with inmate workers about the time-clock issue, and then he would speak with plant management about the problem. (*Id.* at 111, 112.)

Baker testified that, when he became Operations Manager, he established an "open-door policy" through which he "allowed" inmates to make informal grievances by "repeatedly talking to [him] about things[.]" (Doc. 213, at 226.) Baker and Adams spoke multiple times during July and August 2015 about the time clock. (*Id.* at 272–77.) Barry Waddell, another inmate employee of TRICOR, testified that he and "a lot of employees" asked Baker about the time clock "several times over the weeks" (Doc. 212, at 145–46); however, Baker testified that Adams was the only inmate he remembered complaining about the issue (Doc. 213, at 276). Baker and some of the inmates believed that Baker fixed the time clock in August (*Id.* at 272–77; Doc. 212, at 127), but at least one inmate was shorted pay through at least November 2015 (Pl. Ex. 29; Doc. 213, at 115–21).

Tennessee Offender Management Information System ("TOMIS" or "eTOMIS") is a database through which TDOC and TRICOR employees can access information about an inmate's appearance and housing unit location, among other things. (Doc. 212, at 48, 133.) TRICOR employees can add notes to inmates' TOMIS files (*see, e.g.*, *id.* at 134), including notes about absenteeism, behavioral issues, or job performance at TRICOR. (*Id.* at 108.) TDOC disciplinary reports are also included in inmates' TOMIS files. (*See, e.g.*, *id.* at 6.) On August 12, 2015, Baker placed a "program note" in the TOMIS files of Adams and three other board counters—Waddell, Phillip Shupe, and Napoleon White. (Stip. Exs. 2–5; *see also* Doc. 212, at 149; Doc. 213, at 277–78, 283–84.) Each note states: "OFFENDER WAS ADVISED TO NOT PRE-MARK THE TALLY SHEETS TO REFLECT ANTICIPATED BOARDS TO THEIR COUNTING STATION UNTIL THE BOARDS ACTUALLY ARRIVED AT THE STATION

AND THE DELIVERING OFFENDER HAD SIGNED THE TALLY SHEET." (Stip. Exs. 2–5.) Board counters were not supposed to pre-mark their tally sheets because it could result in overcounting and overpayment of employees, since board scrapers were paid per board. (Doc. 213, at 289–91.) Adams and Waddell testified that the conversation or conversations Baker described in the TOMIS notes never happened. (*Id.* at 206; Doc. 212, at 134–35.)

Another of Adams's coworkers, Joseph Overman, testified that Adams was "adamant" about always doing his job properly and never pre-marked his boards. (Doc. 213, at 98–99.) Adams testified that Baker did not inform him that he had placed a note in his file. (*Id.* at 206.) Baker testified that, while he was TRICOR Operations Manager, he entered about ten to fifteen program notes per day in TOMIS (*id.* at 283–84), and there was no requirement for inmates to be told when they are given a program note (*id.* at 277–78).

These August 12, 2015 program notes were the first program notes Adams, Shupe, or White received. (*See* Stip. Ex. 2, 4, 5 (each stating "No More Notes Exist for Offender").) After receiving the August 12, 2015 program note from Baker, Waddell received a second note for pre-marking boards. (Doc. 212, at 152.) At that time, he was warned that he would receive "disciplinary action" if he received another. (*Id.* at 136, 151.) Baker, Waddell, and Adams each testified that TRICOR supervisors can request that TDOC terminate an employee after he accumulates three or more program notes for the same infraction. (*Id.* at 129, 140, 143; Doc. 213, at 195, 206, 278–79.)

When asked whether a program note can interfere with job changes and promotions, Baker responded that it "depends on what the program note's for." (Doc. 213, at 279.) When asked whether a program note could cause an inmate to lose sentence-reduction credits, he replied, "I have no idea about sentence reduction credits. I never took anybody's sentence

reduction credits." (*Id.*) When asked whether he "had the ability to not award an inmate his credits in a particular month," Baker stated, "I have no idea, because I've never done it. I always gave all inmates all their sentence reduction credits. I never denied any inmate, even if they were—received multiple program notes." (*Id.*)

Because a program note can lay the groundwork for termination, Adams considered the note a disciplinary action even though he faced no immediate consequences from it. (*Id.* at 195.) Overman testified that program notes were "mostly" given for "poor performance." (*Id.* at 99.) Other inmate witnesses' testimony also characterized notes as generally negative. (Doc. 212, at 133, 147.) In contrast, Baker testified that program notes were not necessarily bad and that their primary function is "to document and just informally correct anything that might be bad or maybe not bad." (Doc. 213, at 284.) There is evidence of only one positive program note in the record. (Stip. Ex. 6.) No evidence showed Baker had ever issued a positive program note or that any of the witnesses testifying had ever received a positive program note. (*See generally* Docs. 212, 213.)

### B. The Events of August 31, 2015

At the beginning of the morning shift on August 31, 2015, Baker announced to all inmate employees a new policy that board counters would be rotated during their shift. (Doc. 213, at 227.) Adams and Baker agree that they had three or four conversations that morning after Baker made the announcement. (*Id.* at 204, 240–41.) It is undisputed that Adams told Baker that he had already filed and resolved a grievance against a previous policy involving rotation of the board counters, and Baker told him that, if he disagreed with the new policy, he could file a grievance. (*Id.* at 130–31, 227, 230.) Adams testified that he could not file a second grievance because of a TDOC policy against filing multiple grievances involving a "same or similar

incident" or issue. (*Id.* at 184.) He explained that his previous grievance against a policy of rotating some, but not all, of the board counters was resolved after he proposed a solution that Shaw management agreed to adopt. (*Id.* at 131, 179–84.)

According to Adams, Adams went up to Baker's office after the announcement, and the two walked outside to the front porch of the plant entrance. (*Id.* at 130–31, 227.) When Baker told him he could file a grievance, Adams "informed" Baker that he would instead write a letter to Jason Woodall, TDOC's Deputy Commissioner of Operations, who oversees grievance procedures. (*Id.* at 146–47.) Adams believed it was his only recourse to have his previous grievance upheld. (*Id.* at 147.) Adams testified that, after he stated he would write a letter, "it was like everything was okay, and [Baker] went back up to his office, and [Adams] went back on the production floor." (*Id.*) But "a few minutes later," Adams went to Baker's office to ask him about his plans to begin rotating all the board counters, Baker responded he "probably would that day," Adams said "that would be fair then," and Adams left. (*Id.*) Adams testified that these conversations with Baker constituted an informal grievance that complied with TDOC Policy 501.01 for Inmate Grievance Procedures. (*Id.* at 142; Stip. Ex. 1.)

Adams recounted that he then went to Randy Jones's[2] office to ask if Jones, an inmate who worked as a clerk at the plant, had suggested the new policy to Baker. (Doc. 213, at 147; Doc. 212, at 46.) Adams testified that Jones became "aggravated" at his questioning and asked Adams to go with him to Baker's office. (Doc. 213, at 148.) Adams did not want "to bother with this" and began to return to his work station; however, he changed his mind and headed back toward Baker's office to "make sure" Jones did not tell Baker "something that didn't happen." (*Id.*) Adams testified that, at that point, Baker was already coming down the stairs and

---

[2] Jones did not testify at trial.

took Adams outside again, where Baker "got up in [Adams's] face" and "pointed at [Adams's] face" and "said, 'If you ever even talk to Randy Jones again, I'll fire you.'" (*Id.*)  According to Adams, Baker then told him to "'[c]lock out and go in,' and he turned around and he went back up to his office." (*Id.*)  Adams then returned to his work station to get his belongings and was heading to the time clock when Corporal Brian Lovitt approached to escort him from the plant. (*Id.* at 149.)  Adams asked Lovitt to escort him to Baker's office to ask if he was being fired and because he wanted to ensure Baker would not claim he had done anything he had not done, and Lovitt agreed.  (*Id.*)  Adams testified that when he asked Baker, in front of Lovitt, if he was fired, Baker responded, "Yes, for creating a disturbance." (*Id.* at 213.)  Lovitt then escorted Adams from the industry building, and Adams went back to his housing unit.  (*Id.* at 149, 248.)

In contrast with Adams's version of events, Baker testified that Adams "got progressively angrier" during their conversations, as he realized Baker was not going to revise the new policy of rotating the board counters.  (Doc. 213, at 240–41.)  According to Baker, Adams then threatened to "stomp" Randy Jones, an inmate who worked as a clerk at the plant.  (Doc. 212, at 46.)  When asked what the "deal" was with Adams and Jones, Baker speculated that Adams "somehow got it in [his] mind" that Jones "was involved" in the decision to rotate the board counters.  (Doc. 213, at 220.)  Baker maintained that Adams said he would "call Jason [Woodall]," not write him a letter, as Adams testified.  (*Id.* at 146–47, 156–57.)[3]

---

[3] TDOC Policy 507.02, under the heading "Inmate Rights and Responsibilities/Title VI/Grievances," provides that inmates at BCCX "have the right to unrestricted correspondence with the commissioner of corrections and/or his or her staff."  (Pl. Ex. 8.1, at 1–2; Doc. 212, at 37–39, 94–95; Doc. 213, at 94, 118.)  Inmates may also exchange mail with anyone, "provided that it does not jeopardize the safety, security, or operation of the institution or the safety of persons within or outside the institution."  (Pl. Ex. 8.1, at 1–2; Doc. 212, at 39.)  TDOC policy also encourages "informal resolutions of grievances" and provides that grievances should be "resolved at the lowest possible level in the grievance procedure."  (Pl. Ex. 7, at 2, 4.)  TRICOR

Baker later documented his version of the incident in a handwritten report:

> On 8-31-15 at 7:15 a.m., Offender Christopher Adams did approach me unhappy with a management decision. During the course of this discussion, Inmate Adams #328180 did state to me that [Adams] was planning to "stomp" Randy Jones, (another offender). Inmate Adams then became loud and shouted at me at the top of his lungs, that he would "have my job" and that he was planning on calling Mr. Jason Woodall about me. Inmate Adams then followed me into the office and continued to argue with me. Inmate Adams was issued a disciplinary for creating a disturbance and he was removed from the industry building.
>
> Based on Inmate Adams [sic] direct threat to me on inmate Randy Jones, I explained this to Lieutenant Lowell Wood,[4] who placed inmate Adams on pending investigation. I was concerned that Inmate Adams would follow through on his threat to harm another offender.

(Stip. Ex. 8.) Baker also entered a Program Note that day for Adams, which stated:

> OFFENDER WAS CITED FOR CREATING A DISTURBANCE WHEN HE TOLD MYSELF THAT HE WAS GOING TO "STOMP" ANOTHER OFFENDER. HE SHOUTED AT ME AT THE TOP OF HIS LUNGS AND STATED THAT HE WOULD 'HAVE MY JOB' AND THAT HE WAS CALLING MR. JASON WOODALL. OFFENDER WAS REMOVED FROM THE BUILDING. JOB DROP IS REQUESTED.

(Stip. Ex. 9.)

Lovitt testified that he was assigned that day to the TRICOR industry building, where his responsibilities included "[a]ccounting for all offenders that were there" and "making sure it was a safe environment." (Doc. 212, at 12.) If an inmate became violent, Lovitt's duties would include "immediately restrain[ing]" and "remov[ing]" him from the TRICOR building. (*Id.* at 15, 30.) Lovitt testified that he did not hear anyone shouting from where he was sitting about 100 to 150 feet away from the front porch, although he expected he would have heard such shouting because the door likely would have been open at that time of the morning. (*Id.* at 16–18.) Lovitt also testified that TRICOR employees have radios that they can use to call for TDOC

policy requires TRICOR staff to comply with TDOC's inmate grievance procedures. (Pl. Ex. 7, at 1; Doc. 213, at 208.)

[4] Wood did not testify at trial.

security assistance.  (*Id.* at 15.)  Threatening or yelling at a staff member would warrant the use of the radio to call for assistance, but Lovitt received no radio calls.  (*Id.* at 16.)  Baker testified that he did not recall having his radio with him when Adams shouted and threatened Jones. (Doc. 213, at 248.)  Baker testified that he asked Lovitt to escort Adams out of the building (*id.* at 249) but did not remember whether he told him Adams had yelled or threatened another inmate  (*id.* at 221).

Baker testified that, after advising Adams that he was terminated and watching Lovitt escort him from the plant, he

> handwrote [a statement] fairly quickly after it happened, where it would be fresh
> in my mind, because I'd been used to documenting.  So at some point in a—real
> quickly I wrote the note, I went to TDOC part of—the portion of the compound,
> which was approximately 500 feet away, and there was a yard officer there, I
> think his name was Kirby.  He was there, and I think Lieutenant Wood might
> have been there, and I explained to them what happened with Mr. Adams, why
> he'd been sent back to his unit, and I said, 'Here's what happened, this, this, this.
> Lovitt was there.  I sent him back.  I'm going back to the plant.'  And that was
> my—the end of my involvement with anything to do with TDOC documentation.

(*Id.* at 292–93.)  According to this testimony, Baker wrote his statement before he spoke with Wood.  (*Id.*)  However, according to Baker's handwritten statement, *supra*, he had already spoken with Wood before he wrote the statement.  (Stip. Ex. 8.)  Ultimately, on cross-examination, Baker testified that he did not "remember the exact time line."  (Doc. 213, at 305.)

### C.     Segregation for Charge of Creating a Disturbance

Adams testified that he was in his housing unit for about an hour and a half after he left the industry building on August 31, 2015.  (*Id.* at 149.)  Two TDOC officers then brought him to administrative segregation at 8:45 a.m.  (*Id.* at 48, 149; Stip. Ex. 10.)  A Contact Note entered for Adams at that date and time states:  "INMATE WAS PLACED IN UNIT 1 FOR STATEMENTS HE MADE ABOUT INMATE RANDY JONES AND THREATS HE HAD

SPOKEN TO DAVID BAKER TRICOR MANAGER AGAINST INMATE JONES." (Stip. Ex. 10.)

When asked if it was "plausible" that an inmate created a disturbance but was nonetheless allowed "to walk away and remain at liberty for one hour and a half before being segregated[,]" Lovitt answered, "Normally, no." (Doc. 212, at 35–36.) Robert Wayne Stith, TDOC Institutional Investigator, also affirmed that "it is the habit and routine practice at the BCCX for the sake of the security of the institution and the safety of those therein that when inmates become loud, aggressive, threaten violence against others, become unruly and belligerent, that they're always immediately handcuffed and taken to segregation[.]" (Doc. 213, at 54, 90–91.) He testified the "inmate would not be allowed to remain at liberty for an hour and a half." (*Id.*) In contrast, Baker initially testified that, during his employment with the TDOC, "inmates that became loud, belligerent, and made threatening comments about intake staff" were "not necessarily" immediately taken to segregation. (*Id.* at 216–17.) However, Adams effectively impeached Baker with his prior admission that states, "During [Baker]'s employment with the TDOC in situations which [Baker] was directly involved in, inmates that became loud, belligerent, made threatening comments about intake staff . . . were immediately taken to segregation." (*Id.* at 216–17; Pl. Ex. 1.1.)

TDOC employee Matthew Kirby prepared and entered a disciplinary report in TOMIS at 9:26 a.m. (Stip. Ex. 12.) Sergeant Wade Slatton served it on Adams in segregation that afternoon. (Doc. 213, at 150.) That report contains Baker's first-person description of Adams's alleged threats and shouting. (Stip. Ex. 12.) Adams testified that this was the first time he knew what Baker had reported about him: "When I got to reading the allegations that he made in that,

I couldn't believe what it said, because I hadn't done what it—what the allegations said that I had." (Doc. 213, at 150.)

Adams then testified about the conditions of segregation and the privileges he lost while there:

> So during this time I'm stuck in about a 68-foot square building—or room with— just freezing to death. I can't see outside the window. There's nobody to talk to. I've lost all the privileges that are associated with living in the general population. I only got to have recreation three times a week, could use the phone once a day for 30 minutes to call my family, and I was only allowed to take three showers [a week].
> . . .
> And even in the middle of all that you've got people in there that are constantly banging and yelling, so you can't get any sleep. So it's just a really stressed-out environment. And up until this point I've never been convicted of a disciplinary infraction as long as I've been locked up. And so now I'm sitting there in the hole wondering, "Well, how am I going to get vindicated from this and not be found guilty of a charge when I've got a state official that's making up allegations that I've not done?"

(*Id.* at 150–51.)

On September 6, 2015, Adams submitted to the segregation unit officer a formal grievance against Baker for his allegedly false reports against Adams. (*Id.* at 175; Pl. Ex. 25, at 15). While Adams was still in administrative segregation, TDOC Internal Affairs Investigator Sean Smith investigated the charge against Adams. (Doc. 213, at 6–7.) Smith testified that TDOC, not TRICOR, decides whether to send inmates to segregation and that "initially" inmates will be put in "segregation for incidents like this," such as creating a disturbance. (*Id.* at 33; *see also id.* at 96 (Stith testifying similarly).)

Smith testified that he was "sure" he reviewed video surveillance in the course of his investigation of the incident, although he did not "actually remember viewing it." (*Id.*) The disciplinary board dismissed the charge against Adams because Smith's investigation yielded

"no findings . . . that show[ed] [Adams] creating a disturbance." (*Id.* at 7, 17–19.) Adams was released from segregation on September 8, 2015, at about noon. (*Id.* at 157.)

### D.    Charge of Attempt to Intimidate Employee

Later that day, TDOC charged Adams with attempt to intimidate an employee based on the August 31, 2015 incident between Adams and Baker. (*Id.* at 158; Stip. Ex. 13.) Smith testified that he filed the charge based solely on statements from Adams and Baker, including those from Smith's interview with Baker. (Doc. 213, at 19–21; Pl. Ex. 1, at 9, 11, 21.) Smith further testified that an inmate would not be charged with attempt to intimidate an employee for saying he would contact the deputy commissioner of operations, as long as he was not "causing a scene" and spoke "regularly." (Doc. 213, at 20–21.)

The TOMIS disciplinary report associated with the September 8, 2015 charge contains no reference to Jones or threats against another inmate. (*See* Stip. Ex. 13.) The description of Adam's alleged misconduct states that he "BECAME ANGRY AND WAS MAKING THREATS TOWARDS TRICOR OPERATIONS MANAGER DAVE BAKER." (*Id.*) It does not state what threats Adams allegedly made to Baker. (*See id.*)

Adams was subject to further disciplinary sanctions for the second charge and waited thirty-seven days for the second charge to be resolved. (Doc. 213, at 157.) It was ultimately dismissed due to a "due process violation" associated with the "third page" of the TDOC disciplinary report. (Stip. Ex. 14.)

### E.    Adams's Resignation

Smith testified that, after the charges were dismissed, Adams was "supposed to have been able to return to [his] job." (Doc. 213, at 23-25, 157.) Adams approached Lovitt about returning

to work.  (*Id.* at 158.)  Adams testified that he tried to go to the plant but "was told that Mr. Baker didn't want [him] over there."  (*Id.*)

Adams testified that he went to speak with Sergeant April Hubbard and asked her to call Baker to discuss Adams's return to work.  (*Id.*)  She did so.  (*Id.*)  Baker testified that he told Hubbard that Adams was not coming back and would not be rehired to work at the plant after Adams threatened him and another employee, regardless of the results involving TDOC disciplinary actions.  (*Id.* at 257.)  Baker testified that Hubbard called him back a few minutes later and advised him that "Adams was no longer wanting to work [at the plant]."  (*Id.* at 260.)  Baker testified that he responded, "That works for me."  (*Id.*)

Adams testified that he decided to resign "because there was a threat of an incompatible." (*Id.* at 164, 168; Pl. Ex. 1, at 9.)  Adams explained his reasons for fearing an incompatible:

> [A]n incompatible would cause an inmate to be transferred to another prison.  I have a reasonable expectation to stay at the same prison for the entire—entirety of my sentence, because TDOC doesn't do routine transfers.  So, had I been transferred, I would have been transferred further away from my friends and family, where I wouldn't have been able to get visits as well.

(Doc. 213, at 168–69.)  When Baker disputed using the "particular phrase" of "filing an incompatible on [Adams] (*id.* at 257), Adams impeached him with his previous admission that "Baker rescinded his intention to file an incompatible in exchange for Adams's resignation" (*id.* at 260; Pl. Ex. 1, at 5).  A few days after the phone call between Hubbard and Baker, Adams filled out the TDOC Request for Program Dismissal form, stating, "I no longer wish to work for TRICOR."  (Doc. 213, at 166, 261; Stip. Ex. 7.)

The parties seemed to disagree about whether Baker had the authority to terminate Adams from his position at TRICOR.  Adams testified that Baker did not have actual authority to terminate him but could only request his termination through the Inmate Job Coordinator and the

warden.  (Doc. 213, at 163–66.)  He referred to TRICOR policy 1011, Section V(A), Subsection C, which states that "[t]he chief executive officer has designated the following staff to review and approve requests for nondisciplinary job dismissals made by offenders' work supervisors to the institutional inmate jobs coordinator in accordance with TDOC Policy 505.07."  (Stip. Ex. 1; Doc. 213, at 164.)  Smith testified that getting Adams charged with a disciplinary would be "one way [for Baker] to get [Adams] removed from working at TRICOR."  (Doc. 213, at 26.)  After referring to the dismissal of the second charge, Baker's counsel asked Baker if TRICOR had an "obligation . . . to hire back" an inmate employee.  (*Id.* at 299.)  Baker answered, "Not—not that's made a threat to this level.  This—What Mr. Adams did was beyond a program note; it was—it was gross misconduct.  I couldn't have him back over there, for the safety of myself and other inmates."  (*Id.* at 300.)

### F.    Damages

Adams explained his losses due to resigning his position at TRICOR:

> Because of my resignation, I was forced to resign an $8.45-per-hour job, I lost my
> seniority ranking, which was 25 at that time, now is 101.  The importance of
> seniority ranking at the plant is because it determines whether you get better jobs
> and promotions . . . .
> . . .
> . . . I make $1.20 an hour less now than I did when I was forced to resign. . . .
> Everything's based off seniority.  If you've got more seniority, you get a chance
> to get the better jobs, bumped to more wages to make more money and all that.
> As a result of having to resign, and then I was gone for almost a year before I
> could get my job back, so I lost close to $11,500 in wages during that time.

(*Id.* at 169.)  Adams regained a job at TRICOR almost a year later, partly because Baker took a nine-month leave of absence.  (Doc. 212, at 105; Stip. Ex. 1, at 6; Pl. Ex. 1.)  However, because Adams had lost his seniority rank, he was assigned the more strenuous and less desirable job of board scraper:

Once I started back, they put my back in the entry-level position, and of course I make $1.20 an hour less now, and I've lost almost $2,500 in wages during that time. . . . And because of being put back in that entry-level position, I've been stuck in one of the worst jobs in the plant for two and a half years now almost, and that's because I lost my seniority and had to start all over again.

(Doc. 213, at 170; Doc. 212, at 104.)

## II.    FINDINGS OF FACT

The Court must decide whether to credit the testimony of Adams or of Baker as to what occurred on the morning of August 31, 2015. In Adams's version of events, Adams utilized Baker's open-door policy to complain about the new management decision to rotate the board counters. Their last private conversation ended with Adams stating he would contact Woodall rather than file a second grievance about the same issue. In Baker's version, Adams became so angry that he yelled, threatened to attack another inmate, and threatened Baker's job.

Adams's version is more plausible than Baker's. Adams was able to describe each conversation he and Baker had that morning, whereas Baker's testimony was much less detailed other than the allegations in his statement and subsequent program and contact notes. Lovitt testified that he would have heard Adams's alleged yelling, but he heard nothing. Both Stith and Smith testified that, when inmates become loud or make threats of violence, they are immediately handcuffed and sent to segregation. Baker admitted that, when he worked at TDOC, he immediately sent inmates to segregation who became loud or threatened staff.

Despite Baker's insistence that Adams was loud and threatening, he did not call TDOC officials to intervene. When Baker did speak with Lovitt, he asked him to escort Adams from the plant but did not tell him what happened or request that he restrain Adams or bring him to segregation. Smith found nothing on video surveillance to support the charge of creating a disturbance. Considering the testimony of each of these witnesses, it is more likely than not that

Adams never shouted or raised his voice during his meetings with Baker. The charge of creating a disturbance was dismissed because Smith's investigation yielded no findings to support it. Given that the Court has already found that the portions of Baker's testimony concerning Adams's yelling were most likely inaccurate, there is likewise less reason to credit his testimony that Adams made threats. Additionally, it is unlikely that Baker—after his seventeen years of experience as a TDOC official—would have had Adams only escorted from the plant rather than immediately placed in segregation, if he had really become loud and threatening. For these reasons, the Court also finds it unlikely that Adams threatened Jones or Baker's job.

After duly considering all of the evidence presented at trial, the Court makes the following findings of fact by a preponderance of the evidence:

1) TDOC policy encourages inmates to resolve their grievances informally.

2) Baker had an open-door policy aimed at informally resolving inmates' grievances.

3) Adams spoke with Baker about the time-clock issue multiple times during the months of July and August 2015.

4) Adams's conversations with Baker about the time-clock issue complied with TDOC Policy 501.01 for Inmate Grievance Procedures.

5) The program note Baker placed in the files of Adams, Waddell, Shupe, and White could result in their being terminated after receiving two additional notes for the same infraction.

6) Adams incurred no actual harm from the program note Baker entered in his file about allegedly advising him not to pre-mark boards.

7) Adams's grievance about the policy of rotating board counters was not frivolous, given that his previous grievance on a similar issue had previously been resolved in his favor.

8) At no time during the morning of August 31, 2015, did Adams become loud or belligerent, or create a disturbance.

9) At no time during the morning of August 31, 2015, did Adams yell, shout, threaten anyone with violence, or otherwise engage in impermissible conduct. More specifically, Adams did not tell Baker that Adams would "stomp" Jones, and Adams did not say to Baker, "I'll have your job."

10) Under TDOC policy, writing to Woodall would have been a permissible avenue for Adams to have his grievance addressed.

11) During his last private conversation with Baker on the morning of August 31, 2015, at about 7:15 a.m., Adams stated he would write Woodall.

12) During his August 31, 2015 conversations with Baker, Adams's conduct complied with TDOC Policy 501.01 for Inmate Grievance Procedures.

13) Baker gave inaccurate written and oral reports about Adams to TDOC, specifically that Adams yelled and threatened to stomp Jones and "have [Baker's] job."

14) Baker prepared his handwritten report after he had already spoken to Wood about the specific charge Adams would receive.

15) Baker knew that, if he submitted the oral and written reports, Adams would be charged with creating a disturbance.

16) Adams was charged with creating a disturbance based on Baker's false reports.

17) Baker knew that, if Adams was charged with creating a disturbance, he would be placed in segregation pending investigation.

18) Adams was placed in segregation pending investigation at about 8:45 a.m. on August 31, 2015, as a result of being charged with creating a disturbance.

19) Adams spent nine days in segregation and was released when the charge of creating a disturbance was dismissed.

20) Baker could request Adams's termination but did not have the outright authority to terminate him.

21) Baker knew that, if Adams was convicted of either of the disciplinary charges, he would be terminated from his TRICOR job.

22) Adams was charged with an attempt to intimidate an employee based on Baker's inaccurate reports.

23) Adams spent thirty-seven days concerned about the outcome of the second charge, attempt to intimidate an employee.

24) After disciplinary charges are dismissed, TRICOR employees are entitled to return to work.

25) Adams resigned from his TRICOR position only because Baker would have filed an incompatible against him if he continued trying to return to work at TRICOR.

26) If Baker had filed an incompatible against Adams, Adams would have been more likely to be transferred to another prison, which would have made it more difficult to receive visits from his friends and family.

27) As a result of his resignation, Adams suffered lost wages of approximately $14,000, from August 31, 2015 to the date of trial, reflecting both the time before he was

rehired at TRICOR and the time during which he has worked as a board scraper, an
assignment which is paid $1.20 less per hour.

28) As a result of his resignation, Adams lost his seniority and was unable to regain that
seniority even when he was rehired to work at the TRICOR plant.

29) Due to losing his seniority, Adams must again work his way up through less desirable
and more physically strenuous assignments.

## III.    STANDARD OF LAW

To prevail on a claim under Title 42, Section 1983 of the United States Code, a plaintiff
must show by a preponderance of the evidence that, while acting under color of state law, the
defendant deprived him of a federal constitutional right. *Thaddeus-X v. Blatter*, 175 F.3d 378,
394 (6th Cir. 1999). To be liable, a state official must have been personally involved in the
alleged misconduct. *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). With respect
to a § 1983 claim for retaliation against an individual for exercising his rights under the First
Amendment, it is well established that "[r]etaliation by public officials against the exercise of
First Amendment rights is itself a violation of the First Amendment." *Zilich v. Longo*, 34 F.3d
359, 364 (6th Cir. 1994). A plaintiff must prove by a preponderance of the evidence that: (1) he
engaged in protected conduct; (2) the defendant took an adverse action against him which would
deter a person of ordinary firmness from continuing to engage in such conduct; and (3) the
plaintiff's protected conduct motivated Defendant's adverse action. *Thaddeus-X*, 175 F.3d at
394.

Concerning the first element, protected speech for incarcerated individuals is more
limited than speech for unincarcerated individuals. *Thornburg v. Abbot*, 490 U.S. 401, 414–16
(1989); *Turner v. Safley*, 482 U.S. 78, 92 (1987). "A prisoner retains First Amendment rights

that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Smith v. Campbell*, 250 F.3d 1032, 1036–37 (6th Cir. 2001) (noting that filing grievances in a way that violates legitimate prison regulations or attempts to intimidate staff members is not protected conduct). Inmates have the right to file non-frivolous oral and written grievances against prison officials. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). When there is an informal grievance policy, officials may not punish prisoners for complying with it, *Maben*, 887 F.3d at 266, or for stating their intention to do so, *Pasley v. Conerly*, 345 Fed. App'x 981, 985 (6th Cir. 2009) (inmate's threat to file a grievance protected). On the other hand, "[a]busive or manipulative use of a grievance system" is not protected conduct. *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012); *see also Reinholtz v. Campbell*, 64 F. Supp. 2d 721, 733 (W.D. Tenn. 1999) ("[T]his case has nothing to do with the legitimate exercise of the right to inform prison staff of problems, and everything to do with the inmate's desire to engage in a power struggle with [prison] staff.").

With regard to the second element, courts have concluded that "the loss of a prison job may be sufficiently adverse to deter a person of ordinary firmness from continuing to engage in the protected conduct." *Walton v. Jones*, No. 14-1299-JDT-egb, 2016 WL 483143, at *6 (W.D. Tenn. Feb. 5, 2016); *Walker v. Brewer*, 2014 WL 1117835, at *2 (W.D. Mich. Mar. 20, 2014) (false allegation of misconduct that caused inmate to be terminated from misconduct was adverse); *Cantanzaro v. Michigan Dept. of Corrections*, 2010 WL 233862, at *6 (W.D. Mich. Jan. 14, 2010) (termination from prison job and false charge of misconduct was adverse). While "[a] prisoner has no constitutional right to prison employment or a particular prison job[,]" *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003), that is immaterial to § 1983 claims based on alleged retaliation against an individual for exercising his First Amendment rights, *Newsom v.*

*Norris*, 888 F.2d 371, 375–79 (6th Cir. 1989). "The lack of entitlement to a particular privilege does not free prison administrators to grant or withhold the privilege for impermissible reasons." *Id.* at 377.

Transfer to administrative segregation is considered sufficiently adverse to satisfy this element. *Herron*, 203 F.3d at 416. Generally, "actions that result in . . . fewer privileges" for prisoners may be considered sufficiently adverse to be capable of deterring protected activities. *Hill v. Lappin*, 630 F.3d 468, 474–75 (6th Cir. 2010); *see also Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004) (possibility of disciplinary sanctions sufficiently adverse); *Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007) (major-misconduct charge that, upon conviction, would cause loss of disciplinary credits was sufficiently adverse); *Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) (considering potential consequences in determining whether action was sufficiently adverse). "[S]ince there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect] need not be great in order to be actionable." *Thaddeus-X*, 175 F.3d at 397. A plaintiff need not establish actual deterrence to establish that the action was adverse enough to deter. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002); *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005).

The third element of a First-Amendment retaliation claim "addresses whether the defendants' subjective motivation for taking the adverse action was at least in part to retaliate against the [plaintiff] for engaging in protected conduct." *Hill*, 630 F.3d at 475; *Smith*, 250 F.3d at 1037. "[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Bloch v. Ribar*, 156 F.3d 673, 681–82 (6th Cir. 1998). "Because the question is whether the adverse action was taken (at least in part) because of the protected conduct, the

causation inquiry centers on the defendant's motive." *Thomas*, 481 F.3d at 441. Because "[m]otive is often very difficult to prove with direct evidence in retaliation cases . . . [,] circumstantial evidence may therefore acceptably be the only means of establishing the connection between a defendant's actions and the plaintiff's protected conduct." *King*, 680 F.3d at 696. Allegations supporting the existence of a retaliatory motive can include "the disparate treatment of similarly situated individuals or the temporal proximity between the [plaintiff's] conduct and the official's adverse action." *Hill*, 630 F.3d at 475. In some cases, "temporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." *Muhammed v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004).

Plaintiffs who prevail on First Amendment retaliation claims are entitled to compensatory damages. *See, e.g.*, *Castle v. Clymer*, 15 F. Supp. 2d 640, 668 (E.D. Pa. 1998) (inmate plaintiff recovered difference between higher paying job he lost and lower paying job he had as a result). First Amendment retaliation also "warrants consideration of an award of punitive damages." *King*, 788 F.3d at 216–17. The factfinder must make a "discretionary moral judgment" whether to award punitive damages. *Id.* Punitive damages are not awarded as of right. *Smith v. Wade*, 461 U.S. 30, 52 (1983). A factfinder may assess punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56. The purpose of punitive damages is "to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Commty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986).

## IV. CONCLUSIONS OF LAW

After applying the elements of a First-Amendment retaliation claim to the factual findings, the Court draws the following conclusions of law.

### A. Baker acted under color of state law.

During all of his interactions with Adams and the aftermath of those interactions, Baker acted within his capacity as TRICOR Operations Manager. Because TRICOR is a state agency, Baker acted under color of state law during all events relevant to this lawsuit. *See Smiley v. Tennessee*, 1:16-CV-469-HSM-SKL, 2017 WL 3975001, at *5, *7 (E.D. Tenn. Sept. 8, 2017) (finding that Defendant Baker was a state actor when he allegedly failed to reinstate the plaintiff to his TRICOR job).

### B. Adams engaged in protected conduct.

First, Adams engaged in protected conduct when he complained to Baker about the time-clock issue several times in July and August 2015. The Court has found that TDOC policy encourages inmates to resolve their grievances informally and that Baker had an open-door policy aimed at informally resolving inmates' grievances. Further, the Court has found that Adams was within the confines of TDOC's policies when he spoke with Baker about the time-clock issue. There is no credible evidence that Adams's conduct was inconsistent with his "status as a prisoner" or interfered "with the legitimate penological objectives of the corrections system." *Smith*, 250 F.3d at 1036. Therefore, his conduct was protected. *See Maben*, 887 F.3d at 266.

Similarly, Adams engaged in protected conduct during his conversations with Baker on August 31, 2015, including when he stated his intention to write to Woodall. The Court has found that Adams told Baker his concerns about the new board-counter rotation policy in a calm

voice and manner consistent with TDOC's policies. Baker argues that Adams's conduct on August 31, 2015, was not protected, because Adams was aggressive and threatening toward Baker. (Doc. 212, at 93; Doc. 221, at 9–11.) But the Court, in crediting Adams's version of events, has found that Adams's behavior did not create a disturbance and that the only "threat" Adams made to Baker was his statement that he would contact Woodall rather than file a second grievance.

The Court has also found that writing to Woodall was a proper action for prisoners seeking to have their concerns addressed and that Adams's grievance about rotating all of the board counters was not frivolous. *See Herron*, 203 F.3d at 415 (holding that pursuing non-frivolous grievances against prison officials is protected conduct). It does not matter whether Adams was correct in his belief that filing a second grievance about rotating board counters would violate TDOC policy. Whether or not Adams could instead have filed a second grievance, contacting Woodall was protected activity under TDOC policy. Since stating an intention to engage in protected conduct is itself protected conduct, *see Pasley*, 345 Fed. App'x at 985, the Court concludes that Adams's statements to Baker constitute protected conduct.

C.    **Baker's August 12, 2015 note, his oral and written statements on August 31, 2015, the resulting investigations, and his threat to file an incompatible were actions sufficiently adverse to deter a person of ordinary firmness.**

i.    *August 12, 2015 note*

The Court has found that, although Adams incurred no harm from the program note Baker entered in his file about allegedly advising him not to pre-mark boards, that program note could result in Adams's termination after additional notes about the same infraction. Without the program note, Adams would receive an additional warning before he could potentially be fired for pre-marking boards. Therefore, the program note was a consequence in itself. Additionally,

the Sixth Circuit has made clear that actions may be sufficiently adverse to deter individuals from continuing to engage in protected conduct even when the action results in only potential consequences. *See, e.g.*, *Churchill*, 377 F.3d at 572; *Thomas*, 481 F.3d at 441; *Brown*, 312 F.3d at 789. Acknowledging the *Thaddeus-X* court's reminder that, "since there is no justification for harassing people for exercising their constitutional rights, [the deterrent effect of the adverse action] need not be great in order to be actionable," 175 F.3d at 397, the Court concludes that the August 12, 2015 program note Baker entered in Adam's file was sufficiently adverse to deter a person of ordinary firmness from continuing to informally voice time-clock grievances to Baker.

### ii. *August 31, 2015 oral and written statements and the resulting investigations*

The Court has found that Adams was charged with creating a disturbance and, later, an attempt to intimidate an employee, based on Baker's inaccurate reports. One of Baker's main contentions at trial was that any adverse action taken against Adams is not attributable to Baker because, as a TRICOR employee, Baker lacked control over the discipline TDOC would impose. (Doc. 212, at 96.) Controlling precedent undermines this argument.

"[A] court may consider the reasonably foreseeable consequences that would follow from a retaliatory act in considering whether the plaintiff suffered an adverse action." *Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005). A defendant is liable for an adverse action if his own action was the actual and proximate cause of the adverse action, even if the adverse action was approved and ordered by other people. *King*, 680 F.3d at 697. In *Siggers-El v. Barlow*, the Sixth Circuit rejected the defendant's argument that the defendant did not take an adverse action against the plaintiff because he did not transfer the plaintiff. 412 F.3d at 701. In that case, the defendant had only completed a security screen, which made the plaintiff eligible for a routine transfer. *Id.* The Court concluded that:

the fact that the Defendant's completion of a security screen of the Plaintiff was not a sufficient condition to transfer the Plaintiff, in that the transfer coordinator must ultimately approve the transfer, does not lead to the conclusion that the transfer cannot be imputed to the Defendant. Rather, the Defendant's performance of the security screen of the Plaintiff set in motion Plaintiff's transfer. That is, without the security screen, he had the same chance as every other prisoner to be transferred. Thus, the Defendant filled out the screen knowing the effect it would have—that it would lead inexorably to the plaintiff's transfer, which is exactly what occurred.

*Id.* Just as the defendant in *Siggers-El* "set in motion" the plaintiff's transfer, *id.*, Baker's inaccurate reports about Adams's conduct "set in motion" the first charge against him, the investigation, and his segregation pending that investigation. The reports also set in motion the second charge, even if Baker was not at all involved in the decision to charge Adams with a second offense, because the second offense was also based on Baker's statements. Baker's actions also set Adams up to lose his job, since Adams would have been terminated if he were convicted of either the first or second charge. Thus, Baker's oral and written statements about the events of August 31, 2015, and the resulting investigations, were actions attributable to Baker.

Finally, Baker's reports and the resulting investigations, resulting as they did in nine days of segregation, thirty-seven additional days of concern about the outcome of the second charge, and the potential loss of Adams's high-paying job, were "sufficiently adverse to deter a person of ordinary firmness from continuing to engage in the protected conduct." *Walton*, 2016 WL 483143, at *6; *see also Walker*, 2014 WL 1117835, at *2; *Cantanzaro v. Michigan Dept. of Corrections*, 2010 WL 233862, at *6.

### iii. Threat to file an incompatible

The Court has found that, after disciplinary charges are dismissed, inmate employees of TRICOR employees are entitled to return to work but that Baker threatened to file an

incompatible against Adams if he continued trying to return to work at TRICOR.  The Court has also found that Adams resigned from his TRICOR position only because of Baker's threat to file an incompatible against him.  Because an incompatible could have resulted in Adams's transfer to another prison, making it more difficult for him to receive visits from his friends and family, the Court deems Baker's threat to file an incompatible sufficiently adverse to deter a person of ordinary firmness from continuing to seek reinstatement.  *Cf. Siggers-El*, 412 F.3d at 701–02 (transfer sufficiently adverse when it would result in the foreseeable consequences that plaintiff would lose his high-paying job and face more difficulty visiting with his attorney).

> **D.** **Adams's protected activity motivated some of Baker's adverse actions.**

> **i.** **Adams's time-clock grievances and Baker's August 12, 2015 note**

Adams did not establish by a preponderance that his time-clock grievances, at least in part, motivated Baker's August 12, 2015 program note.  The connection between Adam's time-clock grievances and the August 12, 2015 program note about pre-marking boards is extremely tenuous.  First, Adams did not establish a close temporal proximity between his time-clock grievances and the program note.  Although testimony established that inmates discussed the time-clock issue with Baker in July and August 2015, Baker and some of the inmates believed that Baker fixed the time clock sometime in August.  If Baker seemed to have addressed the time-clock issue without conflict, it is less likely that he would have retaliated against inmates for time-clock-related grievances.  Second, at least three other board counters besides Adams received the note as well, and Adams was the only inmate that Baker remembered as having complained about the issue.  Adams was unable to corroborate his contention that the board counters who received notes on August 12 were more vocal about the time-clock issue than the other six board counters.  Finally, Baker did not tell Adams about the note.  If his motivation in

issuing the notes was in part to deter employees from complaining about the time-clock issue, it would have made sense for him to tell them about the notes. In sum, the evidence at trial did not establish by a preponderance that Baker entered the note in Adam's TOMIS file in part to retaliate against him for his time-clock grievances.

> ### ii.    *Adams's statement that he would write Woodall and Baker's reports and threat to file an incompatible*

The Court has found that Baker gave inaccurate written and oral reports about Adams to TDOC—specifically that Adams yelled and threatened to stomp Jones and "have [Baker's] job"—and that these reports resulted in TDOC charging Adams with creating a disturbance and placing Adams in administrative segregation pending investigation. Adams stated to Baker his intention to write Woodall at about 7:15 a.m., and, soon after, Baker asked Lovitt to escort Adams from the plant. No more than an hour and a half later, at about 8:45 a.m., Adams was charged with creating a disturbance and taken to segregation. Based on the close temporal proximity and the lack of any other likely explanation for Baker's inaccurate statements about Adams's conduct, *see Muhammed*, 379 F.3d at 417–18, the Court concludes that Adam's statement of his intention to write Woodall motivated Baker's inaccurate statements about his conduct.

The Court has further found that, given Baker's seventeen-year tenure with TDOC before he became TRICOR Operations Manager, he was undoubtedly aware that Adams would be punished as a result of Baker's allegations. Baker knew that, if he gave inaccurate oral and written reports that Adams yelled and threatened to stomp Jones and "have [Baker's] job," Adams would be charged with creating a disturbance and that he would be placed in segregation as a result of the charge. TDOC officials' action of placing Adams in segregation was a natural

28

and foreseeable result of Baker's false written and oral report.  And Adams ultimately spent nine days in segregation as a result of being charged with creating a disturbance.

The Sixth Circuit held, in *King v. Zamiara*, that a defendant need not intend the adverse action itself in order to be held liable for retaliation.  680 F.3d at 696–97.  Instead, Baker is liable if he took an action intending to punish Adams for engaging in protected conduct and that action was the actual and proximate cause of the adverse action, even if the adverse action was approved and ordered by other people.  *Id.* at 697.  Even if Baker's involvement ceased after he reported Adams's alleged conduct on August 31, 2015, he knew that his reports would result in negative consequences for Adams.  Baker is therefore liable for those negative consequences.

Finally, Adams's protected conduct motivated Baker's threat to file an incompatible against him when he returned to work.  Although TRICOR employees are entitled to return to work after disciplinary charges are dismissed, Baker threatened to file an incompatible against Adams when he attempted to return to his job at the plant.  Adams knew that, if Baker filed an incompatible, he was at risk of being transferred to another prison further away from his friends and family, and he resigned from his TRICOR position only as a capitulation to Baker's threat.

After drawing the necessary conclusions of law, the Court concludes that Adams has established all three elements of his First Amendment retaliation claim by a preponderance of the evidence.

## V.  QUALIFIED IMMUNITY

Baker asserts that he is entitled to qualified immunity.  (Doc. 221, at 14.)  Qualified immunity is intended to protect government officials from suit unless they are "plainly incompetent or . . . knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  For that reason, qualified immunity shields officials performing discretionary functions from liability

for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In considering whether an official is entitled to qualified immunity in the context of a First-Amendment retaliation claim, courts determine, first, whether the plaintiff's specific activity was constitutionally protected, and second, whether that right was clearly established at the time the events took place, such that a reasonable official would have known his conduct violated that right. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010). The Court has already determined that Adams's activity was constitutionally protected. Since at least 1995, the right of a prisoner "'to be free from retaliation, in the form of an issuance of a false major misconduct ticket, against the exercise of his First Amendment rights' is clearly established for purposes of qualified immunity." *Scott v. Stone*, 254 F. App'x 469, 475 (6th Cir. 2007) (quoting *Churchill*, 377 F.3d at 571–72. Baker's testimony made clear that the disturbance and threats which he accused Adams of making were considered "gross misconduct." (Doc. 213, at 300.) A reasonable official would have known that giving inaccurate oral and written reports alleging that an inmate had made threats of violence violated that inmate's rights. *Cf. Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015) (holding that a reasonable police officer would have known that fabricating evidence would violate a suspect's rights). Accordingly, the Court finds that Baker is not entitled to qualified immunity.

## VI. DAMAGES

The Court has found that, as a result of his coerced resignation, Adams suffered lost wages of approximately $14,000 from August 31, 2015 to the date of trial, reflecting both the time before he was rehired at TRICOR and the time during which he has worked as a board

scraper, an assignment which is paid $1.20 less per hour.  The Court has also found that Adams's

resignation caused him to lose his seniority rank, and, because he had resigned, he was unable to

regain that rank even when he was rehired to work at the TRICOR plant.  Due to losing his

seniority, Adams must again work his way up through less desirable and more physically

strenuous assignments.

Accordingly, Adams is entitled to compensatory damages for the wages he has already

lost due to Baker's retaliation, *see, e.g.*, *Castle*, 15 F. Supp. 2d at 668, the nine days he spent in

segregation, the thirty-seven days he spent worrying about the outcome of the second charge, and

the loss of his seniority rank.  Adams testified about the extent of his lost wages at trial, and

Baker did not offer any countervailing evidence.  The Court found Adams's evidence credible

that he lost approximately $14,000 in wages as a result of not being able to work at TRICOR

and, later, working in a lower-paid position.

In contrast, the damages to which Adams is entitled for the loss of his seniority rank are

less amenable to calculation.  Adams offered little evidence as to the difference in value between

his previous and current seniority rank.  The amount of damages the Court will award for

Adams's loss of seniority rank reflects that lack of specific evidence.

Lastly, the damages the Court will award for the time Adams spent in segregation and in

worrying about the second charge reflect that, while prisoners generally have no liberty interest

in avoiding administrative segregation, *see Grinter v. Knight*, 532 F.3d 567, 573–74 (6th Cir.

2008) (collecting cases), they nevertheless have an expectation of avoiding proceedings resulting

from retaliation for exercise of their First-Amendment rights.

First Amendment retaliation also "warrants consideration of an award of punitive

damages."  *King*, 788 F.3d at 216–17.  The factfinder must make a "discretionary moral

judgment" whether to award punitive damages. *Id.* They are not awarded as of right. *Smith v. Wade*, 461 U.S. 30, 52 (1983). A factfinder may assess punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56. The purpose of punitive damages is "to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Commty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986). The Court has duly considered the guiding principles but declines to award punitive damages in this case.

The Court will **AWARD** the following compensatory damages:

1) $14,000 for lost wages;

2) $450 for the nine days spent in segregation;

3) $10 for the thirty-seven days spent worrying about the second charge; and

4) $250 for the loss of seniority rank and resulting less desirable position at the plant.

These damages amount to a total of $14,710, plus any interest as provided by law and any costs and fees allowed by the Court pursuant to Federal Rule of Civil Procedure 58(e).

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that Baker retaliated against Adams in violation of his rights under the First Amendment and is not immune from suit. Therefore, Adams is entitled to recover damages as detailed above.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**