UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| CHRISTOPHER ADAMS, | ) | |
| | ) | Case No. 1:16-cv-335 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Susan K. Lee |
| DAVE BAKER, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff Christopher Adams's motion to amend the trial opinion and judgment (Doc. 235). For the reasons set forth below, Adams's motion will be **GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

Adams is an inmate in the custody of Tennessee Department of Corrections ("TDOC") at Bledsoe County Correctional Complex ("BCCX"). BCCX includes several industry buildings where Tennessee Rehabilitative Initiative in Correction ("TRICOR"), a legislatively created program, provides jobs to inmates. *See* Tenn. Code Ann. § 41-22-402(3). Adams worked as a board counter as part of a TRICOR operation that hand-hews wood-flooring boards for Shaw Industries Group ("Shaw"). (Doc. 213, at 250, 253, 288.) This action, brought under 42 U.S.C. § 1983, arose from Adams's allegations that his former supervisor, Defendant Dave Baker, who was the TRICOR Operations Manager, retaliated against him for his informal grievances about unfair workplace procedures in violation of his First-Amendment rights under the United States Constitution.

This matter proceeded to a bench trial on April 1 and 2, 2019. On August 15, 2019, the Court issued a trial opinion containing its findings of fact and conclusions of law. (Doc. 229.) Because the Court viewed Adams's testimony as "more plausible than Baker's," almost every finding of fact was in Adams's favor. (*See id.* at 16–19.) The Court's findings were, in relevant part, as follows. After Adams complained multiple times to Baker about an issue with the time-clock that Adams believed was causing him and other workers to be underpaid, Baker placed a program note in Adams's file. (*Id.* at 16.) Receiving two additional notes could have resulted in termination for Adams. (*Id.*) Adams's subsequent grievance to Baker about a new board-counting policy was not frivolous, and Adams's conduct while complaining about the policy complied with TDOC policies. (*Id.* at 17.) Baker gave "inaccurate" and "false" written and oral reports about Adams to TDOC, knowing that these reports would cause Adams to be punished. (*Id.* at 17–18.) As a result, Adams spent nine days in segregation before the charge against him was dismissed. (*Id.* at 18.) Another charge was then brought against Adams based on Baker's report, and Adams spent thirty-seven days concerned about the outcome of that charge. (*Id.*) After the second charge against Adams was also dismissed, Baker threatened to file an "incompatible," a report that would have caused Adams to be transferred to another prison. (*Id.* at 13.) Solely so that Baker would not file an incompatible, Adams resigned from his TRICOR position. (*Id.* at 18.) Due to his resignation, Adams lost his seniority, although he eventually regained a job at TRICOR as a board scraper. (*Id.* at 14.) That position is a less desirable, lower paid, and more strenuous job than his previous position of board counter. (*Id.* at 14–15, 18–19.) The Court found that Adams's lost wages totaled approximately $14,000, from August 31, 2015, to the date of the trial. (*Id.* at 18–19.) The one finding that was not in Adams's favor was that

"Adams incurred no actual harm from the program note Baker entered in his file about allegedly advising him not to pre-mark boards." (*Id.* at 16.)

Adams also prevailed, for the most part, with respect to the Court's application of the law to the facts. (*See id.* at 23–29.) The Court concluded that Adams "established all three elements of his First Amendment retaliation claim by a preponderance of the evidence." (*Id.* at 29.) The Court concluded that: (1) Baker acted under color of law; (2) Adams engaged in protected conduct when he (a) complained about the time-clock issue and (b) spoke with Baker about the board-counting policy; (3) Baker's actions, in (a) issuing Adams a program note, (b) making inaccurate oral and written statements about Adams, and (c) threatening to file an incompatible against Adams, were sufficiently adverse to deter a person of ordinary firmness; and (4) Adams's protected activity motivated Baker to make inaccurate statements about Adams and threaten to file an incompatible against him. (*Id.* at 23–29.) On the other hand, the Court concluded that Adams did not establish by a preponderance of the evidence that his time-clock grievances motivated Baker to issue him a program note. (*Id.* at 27–28.)

After determining that Baker was not entitled to qualified immunity (*id.* at 30), the Court awarded Adams compensatory damages "amount[ing] to a total of $14,710, plus any interest as provided by law and any costs and fees allowed by the Court pursuant to Federal Rule of Civil Procedure 58(e)" (*id.* at 32). The $14,710 amount reflected $14,000 in lost wages "from August 31, 2015 to the date of trial, reflecting both the time before [Adams] was rehired at TRICOR and the time during which he has worked as a board scraper, an assignment which is paid $1.20 less per hour." (*Id.* at 18–19.) The Court based this amount on Adams's "credible" evidence that he lost approximately $14,000 in wages and the lack of any countervailing evidence. (*Id.* at 31.) The remaining $710 was composed of $450 for the nine days Adams spent in segregation, $10

for the thirty-seven days he spent anxious over the second charge, and $250 for the loss of his seniority rank. (*Id.* at 32.) In accordance with the Court's conclusion that Adams did not establish that his time-clock grievances motivated Baker to issue the program note and the Court's finding that the program note Baker placed in Adams's file caused him no harm, the Court did not award any damages related to his receipt of the program note. (*Id.* at 32; *see id.* at 16, 27–28.) The Court considered, but declined to award, punitive damages. (*Id.*)

On September 6, 2019, Adams moved to amend the trial opinion and judgment pursuant to Federal Rules of Civil Procedure 52(b) and 59(e).[1] (Doc. 235.) His motion is ripe for the Court's review.

**II.     STANDARD OF REVIEW**

Federal Rule of Civil Procedure 52(b) allows a party to move the Court, within twenty-eight days of the entry of judgment in a bench trial, to amend its findings, make additional findings, and amend the judgment accordingly. "Relief under Rule 52(b) is proper only upon a showing of a manifest error of fact or law by the trial court, newly discovered evidence, or a change in the law." *Klumb v. Goan*, No. 2:09-CV-115, 2012 WL 13114829, at *1 (E.D. Tenn. Sept. 28, 2012) (internal quotation marks and citations omitted); *see also Zell v. Klingelhafer*, No. 13-CV-458, 2018 WL 334386, at *3 (S.D. Ohio Jan. 8, 2018), *aff'd,* 751 F. App'x 641 (6th Cir. 2018). Rule 52(b) does not allow parties to relitigate the merits of a case or to advance new issues or theories. *Id.*

Similarly, under Rule 59(e), a court may alter or amend a judgment if there is a clear error of law, newly discovered evidence, or an intervening change in controlling law, or to

---

[1] Adams also purports to bring this motion pursuant to Rule 54(c). (Doc. 236, at 2.) Rule 54(c) does not allow a party to file a motion but rather states that every final judgment, other than a default judgment, "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

4

prevent manifest injustice. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 833–34 (6th Cir. 1999); *ACLU v. McCreary Cty.*, 607 F.3d 439, 450 (6th Cir. 2010). Like a motion under Rule 52(b), a motion for reconsideration under Rule 59(e) should not be used "to raise new legal arguments that could have been raised before a judgment was issued." *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007).

### III.     ANALYSIS

As Adams filed his motion within twenty-eight days of the entry of judgment, his motion is timely under both Rules 52(b) and 59(e). *See* Fed. R. Civ. P. 52(b), 59(e). In his motion, Adams requests that the Court: (1) more fully consider "Adams's First Amendment claims in relation to the notes"; (2) conclude that Adams established the causation element of his claim that Baker retaliated against him by issuing him a program note; (3) increase the award of compensatory damages; (4) award punitive damages; and (5) award prejudgment interest. (Doc. 235, at 1–21.) As set forth below, the Court will award prejudgment interest but will decline all other relief requested.

#### A.     Adams's Program-Note Claim

Adams's first argument for relief is somewhat unclear, and he does not identify which findings or conclusions of law were erroneous and should be amended. (Doc. 236, at 2–3.) The Court understands Adams as requesting that it more fully consider the "Due Process implications" of the program note that Baker added to Adams's file. (*Id.* at 2.) Neither Adams's third amended complaint nor his pretrial proposed findings of fact and conclusions of law included due-process claims. (*See* Doc. 92, at 1, 6–28; Doc. 191; Doc. 229, at 1.) Of course, after a trial has concluded is far too late to add claims.

5

To the extent Adams intends to challenge the Court's finding that he incurred no actual harm from the program note by suggesting that the harm he suffered was the constitutional violation itself, his challenge fails. "[D]amages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages." *King v. Zamiara*, 788 F.3d 207, 213 (6th Cir. 2015) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986)). Adams's evidence of harm was limited to testimony about the adverse actions that program notes can lead to, including termination. (Doc. 236, at 2.) That evidence led the Court to conclude that the program note was an adverse action. (Doc. 229, at 24–25.) However, it did not establish that Adams suffered any actual harm from the program note. Thus, Adams has not identified a clear error of fact or law such that relief under 52(b) or 59(e) would be proper.

Furthermore, even if Adams had suffered harm from the program note, he would not be entitled to recover damages for that harm because the Court found that Adams had not established a causal connection between his protected conduct and Baker's action of issuing him the program note. That brings the Court to Adams's second argument.

### B. Causation of Program-Note Claim

Adams next asks the Court to conclude that Baker was motivated, at least in part, by Adams's grievances about the time-clock issue. (Doc. 236, at 3–9.) The Court agrees with Adams that he produced enough evidence to *allow* the inference that Baker was motivated by Adams's grievances. (*See id.* at 4.) However, the Court was not *required* to draw that inference. After hearing the evidence presented by both parties at trial, the Court was unconvinced that Adams's grievances motivated Baker to issue the program note. (Doc. 229, at 27–28.) The Court listed its reasons in the trial opinion. (*See id.*) Adams raises no argument as to why those

6

reasons inaccurately or incompletely account for the facts.  Again, Adams has presented no error of fact or law and offers no other persuasive reason for the Court to alter its ruling.

### C. Compensatory Damages

Third, Adams requests that the Court reconsider the extent of his injuries, make additional findings, and increase his award of compensatory damages. (Doc. 236, at 9–13.) The Court considered all of the evidence presented at trial that related to Adams's injuries and fully explained its reasoning with respect to damages. (Doc. 229, at 30–31.) These reasons included the amount of evidence, if any, Adams presented at trial for each of his claimed injuries, whether the injuries were amenable to calculation given the evidence presented, and the value of inmates' "expectation[s] of avoiding proceedings resulting from retaliation for exercise of their First-Amendment rights." (*Id.* at 31.) Adams points to no error but rather requests that the Court increase the compensatory-damages award in its discretion. (Doc. 236, at 9.) The Court declines to do so. Adams has not established that he is entitled to relief with respect to the Court's award of compensatory damages.

### D. Punitive Damages

Adams's fourth argument is that the Court should more fully consider the facts and legal authorities relating to punitive damages and decide, in its discretion, to award them. (Doc. 236, at 13.) Punitive damages are never awarded as of right. *Smith v. Wade*, 461 U.S. 30, 52 (1983). Although retaliation in violation of the First Amendment "warrants consideration of an award of punitive damages," *King*, 788 F.3d at 216–17, the factfinder uses "discretionary moral judgment" in deciding whether to award punitive damages. *Id.* The Court fully considered "the guiding principles" of the analysis before declining to award punitive damages. (Doc. 229, at 32.) This

issue warrants no greater consideration than Court has already afforded it. Therefore, the Court will decline to alter its decision with respect to punitive damages.

E.   **Prejudgment Interest**

Lastly, Adams moves for an award of prejudgment interest. (Doc. 236, at 21–23.) Baker asserts, without legal support, that, because Adams has neither previously requested an award of prejudgment interest nor prayed for such relief in the *ad damnum* portion of his third-amended complaint, he is not entitled to it. (Doc. 237, at 8.) However, a final judgment on the merits "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). Accordingly, even though Adams has not specifically requested prejudgment interest before now, the Court will nonetheless consider whether he is entitled to it.

Prejudgment interest compensates "a plaintiff's lost use of funds after his cause of action accrues and before his recovery." *Ortiz v. Bright*, No. 2:98-CV-1031, 2006 WL 1133296, at *3 (S.D. Ohio Apr. 26, 2006) (citing *West Virginia v. United States,* 479 U.S. 305 (1987)). In the Sixth Circuit, courts "commonly award" prejudgment interest on back-pay awards. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170 (6th Cir.), *opinion amended on other grounds on denial of reh'g,* 97 F.3d 833 (6th Cir. 1996) (quoting *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 841–42 (6th Cir. 1994)). Prejudgment interest "compensates [victims] for the true cost of money damages they incurred." *Id.* (quoting *Wilson Metal*, 24 F.3d at 841–42). This true cost includes both "the time value of the lost money as well as for the effects of inflation." *United States v. City of Warren, Mich.*, 138 F.3d 1083, 1096 (6th Cir. 1998). In an action under 42 U.S.C. § 1983, "an award of prejudgment interest is committed to the sound discretion of the

trial court." *Ortiz*, 2006 WL 1133296, at *3 (citing *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 579 (6th Cir. 1984)).

In this case, the Court awarded $14,000 for Adams's lost wages up to the date of trial. Without interest, Adams will not be made whole due to the effects of inflation and the opportunity he lost to invest his wages. For that reason, the Court will award prejudgment interest on the wages Adams should have earned between August 31, 2015, and April 1, 2019, the trial date.

In awarding prejudgment interest, courts in the Sixth Circuit must consider the case-specific factors set forth in *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675 (6th Cir. 2013). These factors include: "the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation." *Id.* at 687. Courts consider these factors using the evidence they have before them. *See Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 808 (6th Cir. 2018) ("[T]here is no indication that the phrase make whole requires a detailed evidentiary demonstration of what use the [plaintiff] would have made of the money had he received it, and there is no precedent in the Sixth Circuit that such a showing is required . . . in civil litigation.") (internal quotation marks and citations omitted).

Adams suggests possible interest rates between 5% and 7% based on his expected returns from investing in mutual funds. (*See* Doc. 236, at 23.) He does not offer anything further to aid the Court in its calculations. In his response to Adams's motion, Baker did not state a position on what the appropriate interest rate or total amount of prejudgment interest would be if the

9

Court were inclined to award it. As a result, the Court is left to fashion an award of prejudgment interest with little input from the parties.

The Court has determined that calculating the interest to accrue on the wages as Adams earned them and compounding the interest daily at rates varying from 3% to 6% — with a 4% interest rate applied for the majority of the time period — will appropriately balance the *Schumacher* factors to result in a fair award of prejudgment interest.[2] First, with respect to the remedial goal of making Adams whole, this method and interest rate accounts for Adams's lost opportunity to invest his wages as he earned them. Adams's testimony established that he would have earned roughly $11,500 in wages from September 2015 to August 2016, and only approximately $2,500 in wages from about August 2016 to April 1, 2019. (Doc. 213, at 169.) Because Adams would not have earned the $14,000 all at once in September 2015, the Court will calculate the interest as he earned the wages, approximating the interest rates he could have received at the time he received each paycheck, rather than multiplying the lump sum by a single interest rate. *See, e.g.*, *E.E.O.C. v. Ky. State Police Dep't*, 80 F.3d 1086, 1098 (6th Cir. 1996) (explaining that compound interest, as opposed to simple interest, more completely compensates victims). Varying interest rates of between 3% and 6% are appropriate because they will approximate what Adams could have earned had he invested it as he earned it. Regarding the second factor, there is no need to prevent Baker from being unjustly enriched, as he did not

---

[2] In order to calculate the amount as described and as accurately as possible, the Court will use the United States Office of Personnel Management's Back Pay Calculator, available at https://www.opm.gov/policy-data-oversight/pay-leave/back-pay-calculator/. The Back Pay Calculator is "a tool provided to help [federal agencies] compute an employee's back pay interest award." U.S. Office of Personnel Management, *Back Pay Calculator Help Guide*, https://www.opm.gov/policy-data-oversight/pay-leave/back-pay-calculator/help/. Designed for a similar purpose, this tool will best approximate the actual lost value of Adams's back pay. Its use is especially appropriate in this case because it allows the Court, with a few reasonable assumptions, to account for the interest Adams would have accrued as he earned it each pay period.

receive the wages Adams would have earned.  As for the third *Schumacher* factor, the lost interest value of Adams's back pay, the chosen varying interest rate is most appropriate in this case.  The interest rates that would apply in the context of post-judgment interest over the period from August 31, 2015 to April 1, 2019 range from 0.04% to 2.73%.  *See* 28 U.S.C. § 1961; Board of Governors of the Federal Reserve System, *Data Download Program*, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (input date range and data type).  On the other hand, the bank prime loan rate, which represents the best rate an individual consumer would be able to get from a bank, ranged from 3.25% to 5.5%.  *Id.*  The chosen interest rates are a fair average of the lowest and highest rates of return that may have been available to Adams over the period.  Finally, with respect to the fourth factor, the inflation rate over that time hovered at around 2%.  *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm.  The chosen varying interest rate is greater than the inflation rate for the period.  That is appropriate, as prejudgment interest should be greater than the rate of inflation in order to compensate Adams for the true cost of his lost wages, including both his opportunity costs and the effects of inflation on the value of the wages.  *See City of Warren*, 138 F.3d at 1096.

After making reasonable, common-sense assumptions about Adams's earnings over time based on the evidence in the record and inputting those figures using the method and interest rates discussed above, the Court determines that an award of $1,935 in prejudgment interest will, along with the damages already awarded, will fairly compensate Adams for his injuries.

IV. **CONCLUSION**

For the reasons set forth above, Plaintiff's motion will be **GRANTED IN PART** and **DENIED IN PART** (Doc. 235).  The Court will decline to amend its trial opinion to alter its

11

findings of fact or conclusions of law; however, the Court will **AWARD** prejudgment interest on Adams's lost wages, in the amount of $1,935.

      **AN AMENDED JUDGMENT WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**